## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNIVERSAL ATLANTIC SYSTEMS, INC., | : | CIVIL ACTION |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | NO.  20-5291 |
| | : | |
| BOSTON MARKET CORPORATION, *et al.*, | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## MEMORANDUM OPINION

**Goldberg, J.**                                                                                   **October 21, 2022**

This matter involves a contractual agreement gone sour between Plaintiff Universal Atlantic Systems, Inc. ("Plaintiff" or "UAS")—an installer of security systems—and its customer, Defendant Boston Market Corporation ("Defendant" or "Boston Market")—a chain of casual dining restaurants. [1]  The parties have filed cross-motions for summary judgment.[2]  For the following

---

[1]     On February 22, 2022, UAS entered into an Equity Purchase Agreement ("EPA") pursuant to which it was sold.  Prior to the closing, UAS was a wholly owned subsidiary of Sunset Legacy, Inc. ("Sunset Legacy").  Pursuant to the agreement of the parties to the EPA, and immediately prior to the closing, UAS transferred and assigned its interest in and liabilities related to the current litigation to its parent, Sunset Legacy.  Thereafter, on March 24, 2022, UAS and Sunset Legacy, with the consent of Boston Market, moved to substitute the plaintiff pursuant to Federal Rule of Civil Procedure 25(c).  On April 13, 2022, I granted that motion, dismissed UAS from the case, and substituted Sunset Legacy as the named Plaintiff.

Nonetheless, I note that all of the relevant contracts and events involved UAS not Sunset Legacy.  For clarity purposes, I will continue to refer to UAS as "Plaintiff" throughout this Memorandum Opinion.

[2]     Under the operative scheduling order dated January 6, 2022, the parties' summary judgment motions were due no later than March 3, 2022.   Plaintiff timely filed a motion for summary judgment on its breach of contract claims.  On March 24, 2022, Defendant filed a joint response and cross-motion for summary judgment.  While the response was timely, the cross-motion was not.  Simultaneously, Defendant filed a motion for the court to accept its cross-motion for summary judgment as timely filed *nunc pro tunc.*  Plaintiff opposed that request.

reasons, I will grant Plaintiff's Motion for Summary Judgment in part and deny it part, and will

grant Defendant's Motion for Summary Judgment in part and deny it in part.

## I.   STATEMENT OF FACTS

For purposes of general background, the following facts are derived from the parties'

evidence and statements of facts.  Where there is conflicting evidence about a particular fact, Federal

Rule of Civil Procedure 56 requires that I take all facts and evidence in the light most favorable to

the non-moving party.[3]

### A.   The Master Agreement Between Plaintiff and Defendant

On October 31, 2000, Plaintiff UAS and Defendant Boston Market entered into a Master

Agreement (the "Master Agreement") and Addendum (the "Addendum") regarding the purchase

and installation of various security systems at Defendant's restaurants, which included Plaintiff's

monitoring and inspection services.[4]  (PSUF ¶ 1; DR ¶ 1.)  Although Plaintiff has a standard form

contract that it uses, portions of the Master Agreement at issue were heavily negotiated between the

parties.  (Pl.'s Mot. Summ. J., Ex. B, Dep. of Scott Elkins ("Elkins Dep.") 131:1–7; Pl.'s Mot.

---

While Defendant's cross-motion is technically untimely, I will nonetheless consider it.
Many of the issues are matters of law that require resolution on summary judgment.  Thus, in order
to fully resolve Plaintiff's motion, I must necessarily address the issues in Defendant's cross-motion.
See Gerow v. State Auto Prop. & Cas. Co., 346 F. Supp. 3d 769, 785 n.3 (W.D. Pa. Oct. 11, 2018)
(noting that although plaintiff's cross-motion for summary judgment was untimely, court would
consider it because, in order to rule on defendant's motion for summary judgment, the court must
necessarily address the issues).  As Plaintiff has had the opportunity to fully brief its opposition, it
will suffer no identifiable prejudice.

[3]     I will, where possible, refer solely to Plaintiff's Statement of Undisputed Facts ("PSUF")
and Defendant's Response ("DR").  If a statement is disputed and the dispute can be easily resolved
by reference to the exhibits, I will cite the supporting exhibits.  If a statement is disputed, but the
dispute cannot be resolved by reference to the exhibits, I will note the dispute without resolving it.
I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

[4]     This Master Agreement is governed by the laws of the Commonwealth of Pennsylvania.
(PSUF ¶ 2; DR ¶ 2.)

Summ. J., Ex. C, Dep. of Cindy Ambrozy ("Ambrozy Dep."), 48:3–12.)  Defendant, acting through

its counsel, M'Lou Balinger requested various changes to the standard form agreement then used

by Plaintiff.  (PSUF ¶ 4; DR ¶ 4.)  For example, although Plaintiff's standard form agreement has

an initial term of five years and a renewal term of five years,  the parties agreed that any renewal

term would be for only one year.  (PSUF ¶¶ 5–6; DR ¶¶ 5–6; Pl.'s Ex. A, "Addendum" ¶ 2.)

The following provisions of the Master Agreement are pertinent to resolution of the motions

before me.  Paragraph 3 of the Master Agreement provided certain limitations on Plaintiff's liability,

as follows:

> 3.    <u>DISCLAIMER AND LIMITATION OF LIABILITY</u>.
> SUBSCRIBER AGREES AND UNDERSTANDS: . . . THAT UAS
> AND REPRESENTATIVES ARE RELEASED FOR ALL LOSS,
> DAMAGE OR EXPENSE WHICH MAY OCCUR PRIOR TO,
> CONTEMPORANEOUS WITH, OR SUBSEQUENT TO THE
> EXECUTION OF THIS AGREEMENT DUE TO THE IMPROPER
> OPERATION OR NON-OPERATION OF THE SYSTEM,
> BREACH OF CONTRACT, EXPRESS OR IMPLIED, . . .

(PSUF ¶ 7; DR ¶ 7 (bold omitted).)

In addition, the Master Agreement contained a provision pertaining to "Default of

Subscriber," that stated:

> In the event of any default by Subscriber, without limiting the rights
> of UAS under this Agreement or at law or equity, UAS shall be
> entitled to retain all prepayments received and Subscriber shall
> immediately pay to UAS (a) all payments then due and payable, and
> (b) 100 percent of all payments which would be due hereunder for the
> unexpired term as liquidated damages and not as a penalty, and UAS
> shall have no further obligation to perform under this Agreement.

(Pl.'s Mot. Summ. J., Ex. A, "Master Agreement" ¶ 14.)  The Addendum to the Master Agreement

modified this paragraph by changing the reference of "100%" to "70%."  (Addendum ¶ 5.)

Paragraph 17 of the Master Agreement provided that "Subscriber shall pay to UAS an

administrative fee (late charge) of 5% of any payment due hereunder received by UAS after the date

on which such payment is due as agreed upon damages and not as a penalty." (Master Agreement

¶ 17.) Paragraph 18 goes on to provide that:

> Subscriber shall pay to UAS all costs and expenses including, without limitation, actual attorneys' fees incurred by UAS and Representatives if any dispute in connection with, arising out of or from, as a result of, related to or as a consequence of the relationship, rights, duties, responsibilities or obligations of the parties created by this Agreement.

(Id. ¶ 18.)

As to judicial actions related to the Master Agreement, paragraph 26 stated:

> All claims, actions or proceedings, legal or equitable, against UAS or Representatives must be commenced in court within one (1) year after the cause of action has accrued or the act, omission or event occurred from which the claim action or proceeding arises, whichever is earlier, without judicial extension of time, or said claim, action or proceeding is barred, time being of the essence of this paragraph.

(Id. ¶ 26.)

Finally, as part of the Addendum, the parties added the following paragraph to the Master

Agreement:

> 37.   Notice of Default.  Excluding activation of any System for any reason whatsoever, in the event Subscriber, in its sole discretion, reasonably determines that Company [UAS] is not in substantial compliance with any material provision of the Agreement, Subscriber shall promptly deliver written notice of default to Company [UAS] specifying in detail the default(s) and the specific provision(s) of the Agreement where Company [UAS] is not in substantial compliance.

(Addendum ¶ 10.)

### B.   **The Oral Authorization Provision**

The standard agreement was originally not tailored to cover the situation where, as here, a

customer maintained multiple locations; rather it was only meant to cover a single location. (PSUF

¶ 15; DR ¶ 15.)  As such, because Defendant required services at multiple restaurant locations, the

parties modified the standard agreement.  (Id.)  Specifically, the parties  agreed to a provision which

4

would allow Defendant to orally authorize the addition of new services at various Boston Market locations.   (Addendum ¶ 39; PSUF ¶ 16; DR ¶ 16.)   This provision, known as the "Oral Authorization Provision," stated:

> Notwithstanding anything contained in the Agreement to the contrary, in consideration of Subscriber hereby unconditionally authorizing the Company to accept oral authorization and direction from Subscriber concerning installations, monitoring, and/or services of Systems in any and all Premises, and the Company accepting such oral authorization and direction from Subscriber, Subscriber agrees that the Agreement shall apply and be in full force and effect as to all Premises where Company or it's [sic] subcontractors install, monitor or service any System prior to, as of, or after the date of this addendum.

(Addendum ¶ 39.)

From roughly 2015 to 2017, Defendant upgraded the alarm systems in many of its locations by having Plaintiff install new alarm panels.   (PSUF ¶ 18; DR. ¶ 18.)   Plaintiff began billing Defendant for services after the new system was installed and went live.   (Ambrozy Dep. 54:20–56:24.)

At the time the Master Agreement was negotiated, Defendant requested that all of the oral contracts arising from the Master Agreement be coterminous, meaning that Defendant wanted every oral contract to have the same end date.   Plaintiff, however, rejected the request because it had never allowed a customer with multiple locations to have coterminous agreements.   (PSUF ¶¶ 21–24; DR ¶¶ 21–24.)

### C. **Plaintiff's Damages Claims**

On June 1, 2020, Plaintiff sent a final notice to Defendant indicating that Plaintiff had made numerous attempts to collect payment for services rendered but had not received any indication that Defendant intended to pay in full.   The letter noted that, if the entire past due balance then owed to

Plaintiff in the amount of $220,458.30 was not paid by June 15, 2020, then all security services would be terminated on June 16, 2020.  (PSUF ¶ 25; DR ¶ 25.)

In April of 2020, prior to this letter being sent, an individual named Jay Pandya had purchased Defendant through his single-member limited liability company, Engage Brands LLC. (PSUF ¶¶ 29–30; DR ¶¶ 29–30.)  Prior to this purchase, none of Defendant's employees had advised Pandya of any issues with invoices previously issued by Plaintiff during the parties' twenty-year relationship.  (PSUF ¶ 31; DR ¶ 31.)  In fact, Randy Miller—general counsel/chief administrative officer and/or president for Defendant from 1994 until after the sale of Defendant to Engage Brands—testified that he was not aware of any legal claims Defendant held against Plaintiff.  (PSUF ¶ 32; DR ¶ 32.)

Upon receipt of Plaintiff's letter, Pandya reached out to Scott Elkins, Plaintiff's president. While the parties offer conflicting details of that conversation, both parties agree that Pandya disputed the amounts allegedly owed.  Defendant concedes that, other than this phone call, it did not do anything else to dispute the amounts Plaintiff claimed it was owed.  (PSUF ¶ 27; DR ¶ 27.)

On October 23, 2020, Plaintiff filed a complaint seeking, in part, $220,458.30 in past due amounts, plus $297,877.24 in liquidated damages under the Master Agreement, and compensation for the alarm panel equipment in Defendant's possession.  Defendant counterclaimed for breach of the implied covenant of good faith and fair dealing.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue of material fact.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  "The non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way."  El v. Se. Pa. Transp. Auth. (SEPTA), 479 F.3d 232, 238 (3d Cir. 2007).  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.   DISCUSSION

Plaintiff seeks summary judgment on its various claims for damages due to Defendant's alleged breach of the Master Agreement and the oral contracts formed thereunder.  Although Defendant does not challenge the existence and validity of the Master Agreement, it disputes Plaintiff's ability to recover on any of its damage theories and seeks summary judgment as to several of Plaintiff's claims.  First, Defendant posits that Plaintiff's failure to prove the existence and definiteness of more than 700 oral contracts precludes it from recovering any damages.  Second,

Defendant presses that, even if the oral contracts are deemed valid, Plaintiff has not established an entitlement to past due amounts on these contracts. Third, Defendant claims that the liquidated damages provision pursuant to which Plaintiff seeks to recover is unenforceable under Pennsylvania law. Fourth, Defendant contends that it is entitled to summary judgment on Plaintiff's claim regarding the value of the panels. Finally, Defendant asserts that Plaintiff's claim for conversion should be dismissed.

A.    **Pennsylvania Law Regarding Interpretation of Contracts**

The law governing the interpretation of contracts in Pennsylvania is well settled. "The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contract parties . . . The whole instrument must be taken together in arriving at contractual intent." Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008) (quoting Murphy v. Duquesne Univ., 777 A.2d 418, 429-30 (Pa. 2001)). "When a written contract is clear and unequivocal, its meaning must be determined by its contents alone." Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010 (3d Cir. 1980) (quoting East Crossroads Ctr., Inc v. Mellon-Stuart Co., 205 A.2d 865, 866 (Pa. 1965)). A contract is ambiguous if it is reasonably susceptible to different constructions and capable of being understood in more than one sense. St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991). Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. Mellon Bank, 619 F.2d at 1012–13.

In construing the language of a contract, "'[t]echnical terms and words of art are [to be] given their technical meaning unless the context or a usage which is applicable indicates a different meaning.'" Fischer & Porter Co. v. Porter, 72 A.2d 98, 101 (Pa. 1950) (alteration in original) (citation omitted). Otherwise, "words employed in a contract will be assigned their clear and plain, common, general, generally accepted, grammatical and ordinary, natural or normal meaning or

sense." Indep. Oil Workers v. Mobil Oil Corp., 441 F.2d 651, 653 n. 4 (3d Cir. 1971) (citation omitted). Where a contract is not ambiguous, but is instead subject to only one reasonable interpretation, it is appropriate for a district court to resolve the issue of interpretation as a matter of law. See Norfolk S. Ry. v. Reading Blue Mountain & N. Ry., 346 F. Supp. 2d 720, 725 (M.D. Pa. 2004) ("A court may grant summary judgment on the interpretation of a contract when the contract is susceptible to only one reasonable interpretation."). However, when a party argues that a contract is sufficiently ambiguous to require parol evidence, that party must advance an alternate meaning of the contract which is commercially reasonable. See County of Mercer v. Unilect Corp., 612 F. Supp. 2d. 638, 649 (W.D. Pa. 2009) (collecting cases), aff'd, 381 F. App'x 156 (3d Cir. 2010). Thus, when addressing these legal and factual issues, courts are called upon to consider the competing evidence and ascribe the most commercially reasonable interpretation to the parties' words and actions. Butters Living Tr. v. SWEPI, Inc., No. 12-cv-272, 2013 WL 5707787, at *5–6 (M.D. Pa. Oct. 18, 2013). If a contract is deemed ambiguous and its interpretation is subject to an assessment of competing evidence, a trier of fact must interpret the contract. Mellon Bank, 619 F.2d at 1011.

**B.      Whether Plaintiff Has Proven the Existence of the Oral Contracts**

Defendant asserts that to recover any of the amounts demanded, Plaintiff first needs to establish the existence and enforceability of hundreds of oral contracts created under the Oral Authorization provision of the Master Agreement. Defendant presses that, despite this burden, Plaintiff has not proven the terms of each oral contract—including, offer, acceptance, duration, and price terms—with sufficient specificity. Accordingly, Defendant reasons that Plaintiff cannot, as a matter of law, recover under such alleged oral contracts.

"Pennsylvania recognizes and enforces oral agreements." Orta v. Con-Way Transp., No. 02-cv-1673, 2002 WL 31262063, at *1 (E.D. Pa. Oct. 8, 2022). The party relying on an alleged oral

contract has the burden of proving its existence.  Edmondson v. Zetusky, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996).  "To establish the existence of an agreement, one must show that: (1) both parties have manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and, (3) there is mutuality of consideration."  Redick v. Kraft, Inc., 745 F. Supp. 296, 300 (E.D. Pa. 1990) (citing Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298–99 (3d Cir. 1986)).  "For a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain."  Lackner v. Glosser, 892 A.2d 21, 30 (Pa. Super. Ct. 2006).

The first element, mutual intent to be bound by an agreement, usually manifests as "'an offer or proposal by one party followed by an acceptance by the other party.'"  Bayliss–Allen v. Cadence Design Sys., Inc., No. 99-cv-3240, 2000 WL 1156857, at *4 (E.D. Pa. Aug. 16, 2000) (quoting Restatement (Second) of Contracts § 22(1) (1981)).  In ascertaining intent, the object of the inquiry is not the parties' subjective intent, but rather "the intent a reasonable person would apprehend in considering the parties' behavior."  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009).  Where an oral contract is involved, "'courts must look to surrounding circumstances and course of dealing between the parties in order to ascertain their intent.'"  Szymanski v. Sachetta, No. 10-cv-2336, 2012 WL 246249, at *4 (E.D. Pa. Jan. 26, 2012) (quoting Boyle v. Steiman, 631 A.2d 1025, 1033 (Pa. Super. 1993)).

With respect to the second element—sufficiently definite terms—Pennsylvania has adopted the Restatement (Second) of Contracts.  Reed v. Pittsburgh Bd. of Pub. Educ., 862 A.2d 131, 135 (Pa. Commw. Ct. 2004). The Restatement provides as follows:

> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement (Second) of Contracts § 33 (1981).  In other words, "[t]he essential terms must be definite enough to provide a basis for enforcing the agreement."  Waterford Mortg. Co. v. Integrated Alarm Servs. Grp., Inc., No. 06-cv-3967, 2008 WL 4589630, at *3 (E.D. Pa. Oct. 14, 2008) (citation omitted)  "If a court, due to indefiniteness or incompleteness, is unable to determine if a contract was performed, the court must find no contract existed in the first place."  Reed, 862 A.2d at 135 (citing Restatement (Second) of Contracts § 33 cmt. c (1979)).

Ultimately, the question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question is for the jury to decide.  Szymanski, 2012 WL 246249, at *4 (citation omitted); see also Solomon v. Luria, 246 A.2d 435, 438 (Pa. Super. 1968) ("[I]n the case of a disputed oral contract, what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact for the jury.").  The court must determine whether a reasonable jury, considering the parties' undisputed actions and words, could find that they formed a binding oral contract.  Such an inquiry may be resolved at the summary judgment stage.  Id.

Here, Plaintiff produces a Balance of Contract spreadsheet, together with authenticating deposition testimony, that purports to show, for each oral contract: system identification, system type, specific service billed for, the store at where the service was provided, the start date of the contract, the term of the contract, when the contract renews, when the contract terminates, months remaining, outstanding amounts due, and unexpired balance owed.  In response to this evidence,

Defendant does not deny the validity of the Oral Authorization provision.  (Pl.'s Mot. Summ. J., Ex. I.)  Defendant also does not dispute that it orally authorized the installation of new systems pursuant to this provision and that such systems were in fact installed in various restaurants owned by Defendant.  Finally, Defendant does not offer any evidence to dispute that Plaintiff, over the course of many years, billed Plaintiff on those oral contracts.

In the face of Plaintiff's Motion for Summary Judgment, however, Defendant proffers two arguments to dispute the existence of the oral contracts.  First, it contends that Plaintiff has failed to prove the essential elements of each of the oral contracts.  Second, it asserts that even if these contracts exists, the ambiguity in the term of these contracts precludes their enforcement.

1.  Whether Plaintiff Has Proven the Essential Elements of Each Oral Contract

Defendant claims that "[Plaintiff's] Motion fails to prove the terms—offer, acceptance, price terms—of each oral contract with sufficient specificity." (Def.'s Resp. Opp'n Summ. J.  4.)  It posits that Plaintiff's Balance of Contract Spreadsheet is insufficient to prove the validity and enforceability of each oral contract absent some other writing regarding the terms of the contracts. According to Defendant, Scott Elkins (Plaintiff's president and co-owner) could not identify even one date upon which new services were allegedly orally requested by Defendant, testifying only that the oral authorizations occurred "likely a few weeks or months before we installed a new system." (Elkins Dep. 104:22–105:11.)   Elkins also testified that he could not tell from Defendant's spreadsheet which of the listings was either a new entire system, the initiation of service, or just an upgrade to something like a cell card.   (Id. at 100:24–101:25.)  Defendant contends that "[g]iven that oral contracts (and damages related thereto) must be proven with precision, Plaintiff cannot sustain its burden based only on spreadsheet created for purposes of litigation."  (Def.'s Reply Br. p. 6.)

Defendant's demand for contemporaneous written proof of the oral contracts contradicts its assent to the Oral Authorization provision, which provided that contracts could be created orally for Defendant's various restaurant locations. That provision indicates that Plaintiff could accept Defendant's "oral authorization and direction" concerning installations, monitoring, and servicing of systems at any of Defendant's restaurant locations. The existence of this provision unequivocally reflects the parties' mutual intent to be bound to such oral contracts.

Additionally, the terms of the contracts, while not detailed in writing, are sufficiently definite to determine the existence of a breach and provide a basis for a remedy. The Oral Authorization provision explicitly states that the terms of the Master Agreement would apply to any such "oral authorizations" of system installations at any of its premises, including the monthly charges and terms of each contract. Under this Master Agreement, the terms, conditions, pricing, and scope of work were clearly set forth in a July 10, 2000 proposal incorporated into the Master Agreement. (Addendum ¶ 15.) The start date for the applicable contract covering each orally authorized and subsequently-installed system was the date that the system was installed and went live. (PSUF ¶ 19; DR ¶ 19; Pl.'s Reply Br., Ex. B, "Elkins Decl." ¶ 11.) The Balance of Contract spreadsheet, together with authenticating deposition testimony from Plaintiff's employees, evidences installations of hundreds of systems, including system number, system type, location, start date, initial term, renewal term, termination date, etc. (Pl.'s Mot. Summ. J., Ex. I.) The fact that this spreadsheet was generated after the start of those contracts does not otherwise undermine its validity.

Moreover, Defendant presents no challenge to the undisputed evidence that—consistent with this provision, and over the course of many years—Defendant repeatedly authorized installations of new security systems by Plaintiff at various Boston Market locations, and Plaintiff billed Defendant accordingly. Defendant also offers no challenge to Plaintiff's evidence that these systems were never fully paid for by Defendant, leaving a past due balance on each contract. Indeed, the current

owner of Defendant, Jay Pandya, testified that prior to his purchase of Defendant in April of 2020—a date subsequent to the "start date" of all of the oral contracts—no one at Defendant challenged the validity of these contracts or related billing.  (Pl.'s Mot. Summ. J., Ex. G, Dep. of Jay Pandya ("Pandya Dep.") 88:13–24.)  Even when Mr. Pandya called Plaintiff's president, Elkins to complain that services were being overbilled, Pandya did not dispute the actual existence of oral contracts for systems at the various restaurants.  (Id. at 39:18–40:25.)  The mere presence of a disagreement over the precise *amount* owed does not undermine the fact that the contracts were in place and breached by Defendant.

In short, I find no genuine issue of material fact as to the existence of the more than 700 oral contracts for installation and monitoring of security systems by Plaintiff as set forth in the Balance of Contract spreadsheet.

### 2.   Whether the Oral Contracts Are Ambiguous as to Their Precise Term

Alternatively, Defendant contends that even if the oral contracts existed and were valid, the ambiguity as to the precise term of each of these contracts precludes them from being enforced.

As noted above, "[c]ourts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous."  Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 76 (3d Cir. 2011); see also In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996).  To make that determination, a court must consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning."  Baldwin, 636 F.3d at 76 (quotations omitted).  The objective, extrinsic evidence proffered may include, for example, "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning."  New Valley, 89 F.3d at 150 (quoting Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993)).

Defendant disputes Plaintiff's position that if Defendant asked for a new "System" to be installed and serviced, that installation created a new contract subject to a five-year term. Defendant reasons that such an interpretation would permit Plaintiff to benefit from a clearly ambiguous contract. Because the contract language mixes and matches unrelated terms, Defendant asserts that Plaintiff's position, taken to a logical conclusion, "could mean that every time [Defendant] requested 'services' (i.e., repairs or something less than installation of a new 'system'), the system would become subject to a new five-year term." (Def.'s Resp. Opp'n Summ. J. 7.)

The plain language of the Master Agreement resolves this issue. It states that Defendant agrees to pay a set amount per month for installation services, call repair services, and monitoring services for a "commercial signaling System ('System')" for a period of "five years." (Master Agreement ¶ 1.) Thus, by its explicit terms, the Master Agreement contract term applies not to each individually-requested service, but rather to each "System" installed by Plaintiff at one of Defendant's premises. The Oral Authorization provision then mirrors this language and states that "Subscriber agrees that the Agreement shall apply and be in full force and effect *as to all Premises where Company or it's [sic] subcontractors install, monitor or service any System* prior to, as of, or after the date of this addendum." (Addendum ¶ 12.) Consistent with this clear language, Plaintiff has never claimed that anything less than installation of a new "System" at a "Premises" triggers a new five-year term. Rather, Plaintiff has only sought damages for the unexpired portion of a new installation contract. Defendant fails to advance any alternate interpretation for this language or identify any contractual language suggesting that a different term applies.

Moreover, even if I were to deem the Master Agreement and Oral Authorization provision ambiguous regarding the term of a new system installation, extrinsic evidence assists in resolving this ambiguity. As noted above, at the time the Master Agreement was negotiated, Defendant requested that all of the contracts arising from the Master Agreement be coterminous, meaning that

Defendant wanted every agreement to have the same end date.  Defendant specifically requested the ability to terminate services at any location with ninety days written notice, and proposed a term that would allow any restaurant location added to the Agreement to be subject to the "then current term as it applies to all restaurants."   (PSUF ¶¶ 21–22; DR ¶¶ 21-22; Pl.'s Ex. D.)   During negotiations, Plaintiff rejected that proposal and struck it from the final Agreement.  (Id.)  Given that the oral contracts created under the Oral Authorization Provision did not have identical end dates, each oral contract was necessarily subject to the five-year term set forth in the Master Agreement.

In a final effort to inject ambiguity into the contracts, Defendant points to several pieces of extrinsic evidence that purportedly show Plaintiff's employees' own confusion as to the term of the oral contracts:

- In his deposition testimony, Plaintiff's president, Scott Elkins, equivocated on whether the five-year term applied to (a) each "store," (b) each new system installation regardless of whether a particular store had received "services" prior to the installation of the new system, or (c) simply an upgrade to an already existing system.  (Def.'s Resp. Opp'n Summ. J. (citing Elkins Dep. 84:4–12, 84:22–85:3, 100:14–15, 102:13–20, 103:5–21).)

- In internal emails among Plaintiff's employees—generated after the relationship with Defendant broke down and while Plaintiff was attempting to determine the balances owed on the contracts—employees could not determine whether to use the "original start date vs [date of installation] start date when calculating term."  (Def.'s Resp. Opp'n Summ. J., Ex. C.)

- Two months after the contract between the parties was terminated, Plaintiff's employees could not determine the precise start date for each system.  (Def.'s Resp. Opp'n Summ. J., Ex. D.)

While this evidence reveals some internal discussion within Plaintiff's ranks as to precisely how to calculate amounts owed, it does not render the contracts ambiguous.  Elkins's deposition testimony, read as a whole, does not show any wavering as to the existence or start date of each oral contract.  In his declaration, Elkins specifically averred that the start date for each of the systems

16

was when the newly installed system went "live" with Plaintiff.  (Pl.'s Reply Ex. B, Elkins Decl. ¶ 11.)

In short, I find that no genuine issue of material facts on the issues of:  (a) whether the parties entered into oral contracts for the installation of security systems, or (b) the precise term of those oral contracts.  Defendant does not challenge Plaintiff's evidence that it did not pay the outstanding balance on those contracts at the time it was due.  Accordingly, I find, as a matter of law, that the parties entered into and Defendant breached oral contracts for installations of security systems at its restaurants, each of which was subject to a five-year term.

### B.    Whether Plaintiff Has Proven an Entitlement to Damages

As the undisputed evidence establishes that the various oral contracts are valid and that Defendant breached these contracts by failure to perform as required, a question remains as to the appropriate remedy.  Plaintiff seeks three forms of damages:  (1) past due amounts, (2) liquidated damages for the balance of the unexpired contract terms, and (3) payment for the value of alarm panels retained by Defendant.

#### 1.    Past Due Amounts

The parties agree that, on June 1, 2020, Plaintiff sent Defendant a letter demanding payment of a total outstanding balance of $220,458.  In support of this amount, Plaintiff provided the Balance of Contract spreadsheet itemizing the specific amounts due on each individual contract.  (PSUF ¶ 25; DSUF ¶ 25.)  Defendant now disputes this amount on three grounds:

First, Defendant contends that Plaintiff does not demonstrate how the past due amount was derived except to say that it is made up of amounts related to both monitoring and service calls. Defendant argues that, subsequent to receipt of the Balance of Contract spreadsheet, Defendant's owner, Jay Pandya, contacted Plaintiff's president and said he believed Defendant was getting overcharged and overbilled.  (Pandya Dep. 34:2–35:23.)

17

Aside from this one phone call, however, Defendant neither indicated what amount it believes is due nor offered any contrary evidence supporting its claim that it did not receive the services provided.  Indeed, Mr. Pandya admitted that prior to one phone call discussed above—and despite the fact that the Balance of Contract spreadsheet shows amounts due from as far back as 2002, but primarily from 2015 through 2019—no representative of Defendant had ever disputed these billed amounts.  (Pandya Dep. 88:22–89:11.)  Absent any evidence showing that the Balance of Contract spreadsheet is incorrect, or that Defendant owes nothing or a lesser amount, Mr. Pandya's blanket "objection" to the overall amount does not create an issue of material fact on the claimed amount of $220,458.

Second, Defendant asserts that Plaintiff failed to comply with its obligation to provide Defendant with written notice of all price increases, thus obviating Defendant's payment obligations.  Defendant cites to paragraph four of the Master Agreement, which states that Plaintiff has "the right to increase the charge(s) provided in paragraph 2 at any time or times after the expiration of one year from the date service is commenced *upon giving [Defendant] written notice thirty (30) days in advance of the effective date of such change.*"  (Master Agreement ¶ 4 (emphasis added).)  Yet, according to Defendant, the Balance of Contract spreadsheet reflects price increases for which there is no evidence that Plaintiff ever provided notice.

This argument is meritless.  The notice provision constitutes a condition subsequent, *i.e.*, "a condition that can be invoked to terminate an existing obligation under a contract (as opposed to a condition precedent which is a condition necessary to the imposition of an obligation)."  Sentry Paint Techs., Inc. v. Topth, Inc., No. 08-cv-1064, 2008 WL 4787579, at *8 (E.D. Pa. Oct. 31, 2008).  Under Pennsylvania law, the existence of the condition subsequent which can be used to justify the termination of a contract must be proved by the terminating party.  Id. (quoting Massachusetts

Bonding & Ins. Co. v. Johnston & Harder, Inc., 16 A.2d 444, 448 (Pa. 1940)).  Defendant, therefore, has the burden of establishing that the notice provision has not been met.  It has not done so.

The sole evidence cited by Defendant is a declaration from Defendant's Director of Risk Management, Sarah Prinzi, which stated that she did "not recall ever receiving a notice from UAS that prices associated with its services would be increased."[5]  (Def.'s Ex. G, Decl. of Sarah Prinzi ("Prinzi Decl.") ¶ 7.)  In contrast to her lack of "recall" about a price increase notice, however, Prinzi also testified that she affirmatively recalled Plaintiff raising prices several times during her tenure, meaning that she was aware of the price increases as they happened.  Id.   According to Plaintiff's president, Elkins, price increases on the oral contracts were often communicated to Prinzi by email or phone call.  (Elkins Dep. 208:5–18.)  Elkins attested that "[a]t no time since the Master Agreement was signed by both parties did [Defendant] object to any price increases."  (Elkins Decl. ¶ 25.)  Such lack of objection by Defendant is crucial since the Addendum to the Master Agreement specifically provided that in the event Defendant believed that Plaintiff was "not in substantial compliance with any material provision of the Agreement," Defendant was required to "promptly deliver written notice of default" to Plaintiff and give it a chance to cure the default.  (Addendum ¶ 37.)  Defendant's General Counsel, M'Lou Bahlinger, testified that she was not aware of anyone at Defendant providing such written notice of default to Plaintiff.  (See Pl.'s Reply Ex. E, Dep. of Defendant's General Counsel M'Lou Bahlinger ("Bahlinger Dep."), 29:13–31:11.)  In turn, Defendant's failure precludes its efforts to avoid paying amounts due on the contract due to the price increases.

---

[5]     Defendant also cites to Ambrozy's deposition, claiming that Ambrozy did not know if Plaintiff ever sent Defendant notices that prices were being increased or if it was customary for Plaintiff to send the required notice to any of its customers.  (See Def.'s Resp. Opp'n Summ. J. 21 (citing Ambrozy Dep. 194:9–17.).)   The portions of Ambrozy's deposition cited for this fact, however, do not support it.

Finally, Defendant disputes Plaintiff's requests for amounts allegedly owed in connection with annual $450 fire alarm inspections that were never authorized. The initial paragraph of the Master Agreement reflects that the box for "inspection services" is not checked, and Ambrozy agreed that the Master Agreement did not authorize annual fire inspections. (Ambrozy Dep. 64:24–67:3.) Plaintiff responds that, pursuant to the Oral Authorization provision, if Defendant orally requested an annual fire inspection, Defendant was authorized to perform the inspections. Moreover, Elkins attested that Plaintiff would not perform annual fire alarm inspections for Defendant unless those inspections were specifically requested.

On this issue, I find that a dispute remains for a factfinder. Plaintiff bears the burden of proving that it is owed the sought-after amounts. The Master Agreement does not appear to authorize the performance of fire inspections, and Plaintiff has produced no witness testimony that affirmatively shows that such services were requested. Accordingly, I will deny summary judgment on only this portion of the balance past due.

Overall, I find that Plaintiff is entitled to recover the entirety of the $220,458 sought on the balance past due, minus the amount owed for the billed fire inspections.[6] With respect to the amounts for fire inspections, Plaintiff will bear the burden of proving that Defendant in fact authorized such inspections and that Plaintiff is entitled to payment for them.

### 2.   Validity of Liquidated Damages Provision

In addition to the outstanding balances on the oral contracts, Plaintiff also demands payment for the unexpired term of these contracts under what both parties describe as the "liquidated damages provision." Defendant challenges the enforceability of this provision.

---

[6]     Absent any guidance from the parties, I attempted to independently identify which portions of the bill were for fire inspection services. I was unable to do so.

"In Pennsylvania, liquidated damages are defined as 'the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable . . . if the breach occurs.'" Benson v. Budget Rent A Car Sys., Inc., No. 08-cv-4512, 2011 WL 4528334, at *5 (E.D. Pa. Sept. 29, 2011) (citations omitted). "[C]ontracting parties may provide for pre-determined liquidated damages in the event one party fails to perform, particularly in circumstances where actual damages would be difficult to estimate in advance or to prove after a breach occurs." Pantuso Motors, Inc. v. Corestates Bank, N.A., 798 A.2d 1277, 1282 (Pa. 2002). However, "[a] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." Id.

Liquidated damages clauses are enforceable "provided, *at the time the parties enter into the contract,* the sum agreed to is a reasonable approximation of the expected loss rather than an unlawful penalty." Brinich v. Jencka, 757 A.2d 388, 402 (Pa. Super. Ct. 2000) (emphasis added) (quoting Carlos R. Leffler, Inc. v. Hutter, 696 A.2d 157, 162 (Pa. Super. 1997)). In making this determination, the court must also "consider the relation which the sum stipulated bears to the extent of the injury which may be caused by the . . . breaches provided against, the ease or difficulty of measuring a breach in damages, and such other matters as are legally or necessarily inherent in the transaction." Perry v. H&R Block Eastern Enters., Inc., No. 04-cv-6108, 2009 WL 2581708, at *4 (E.D. Pa. Aug. 16, 2009) (quoting Brinich, 757 A.2d at 402). "In short, to be permissible, a liquidated damages provision must both (1) address damages that are difficult or impossible to measure and (2) be a reasonable estimate of those damages." Cardiology Care for Children Inc. v. Ravi, No. 17-cv-4743, 2018 WL 1870717, at *4 (E.D. Pa. 2018) (quotation omitted).

Liquidated damages must meet these standards regardless of whether the parties are of equal bargaining power and have, through arms-length negotiations, agreed to the penalty provision.

Robins Motor Transp., Inc. v. Assoc. Rigging & Hauling Corp., 944 F. Supp. 409, 412 n.2 (E.D. Pa. 1996).  Where there are no "discernable disputes of material historical fact," the court should assess the enforceability of a liquidated damages provision as a matter of law.  D.A. Nolt, Inc. v. Phila. Mun. Auth., 463 F. Supp. 3d 539, 545 (E.D. Pa. 2020); see also Leaman v. Wolfe, 629 F. App'x 280, 283 (3d Cir. 2015) (noting that validity of liquidated damages provision is a question of law for the court).  Under Pennsylvania law, the party who has breached a contract and challenges the enforceability of a liquidated damages provision has the burden of showing that the provision was unreasonable.  Benson, 2011 WL 4528334, at *5; see also Days Inn Worldwide, Inc. v. BFC Mgmt., Inc., 544 F. Supp. 2d 401 (D.N.J. 2008) ("Whether a liquidated damages clause is enforceable is a question of law for the court and [t]he burden of proof is upon the party challenging the liquidated damages clause." (internal quotation marks omitted)).

Putting aside the burden of proof, courts have declined to enforce liquidated damages provisions unsupported by any "indication in the record" that the figure at issue "was an accurate pre-estimate of actual damages caused by the breach."  Hanrahan v. Audubon Builders, 614 A.2d 748, 751–52 (Pa. Super. 1992); Compare Robins, 944 F. Supp. at 412 (noting that liquidated damages provision calculated at a rate of fifty percent of delinquent charges is "unconscionably high" and constitutes a penalty provision) with Sheet Metal Workers Local 19 v. Genesio Co., No. 94-cv-4632, 1995 WL 60016, *1 & *3 (E.D. Pa. Feb. 8, 1995) (holding that liquidated damages set at twenty percent of the unpaid balance are reasonable and not unenforceable penalty provisions) and Midlantic Commercial Leasing Co. v. Tender Loving Care, No. 88-cv-9545, 1990 WL 72861, at *3 (E.D. Pa. May 23, 1990) (finding that liquidated damages of 20% of remaining principal balance is reasonable in relation to both anticipated and actual harm); see also 13 Pa. Cons. Stat. § 2718 ("A term fixing unreasonably large liquidated damages is void as a penalty.").  "[I]n doubtful cases, the courts favor the construction which holds the stipulated sum to be a penalty,

and limit[] the recovery to the amount of damage(s) actually shown, rather than a liquidation of the damages." State Bank & Trust Co. v. Philly Wholesale, LLC, No. 16-cv-5568, 2017 WL 3279023, at *8 (E.D. Pa. Aug 2, 2017) (quotations omitted).

Here, the liquidated damages provision is set forth in paragraph fourteen of the Master Agreement:

> **Default of Subscriber**:  In the event of any default by [Defendant], without limiting the rights of [Plaintiff] under this Agreement or at law or equity, [Plaintiff] shall be entitled to retain all prepayments received and [Defendant] shall immediately pay to [Plaintiff] (a) all payments then due and payable, and (b) 100 percent of all payments which would be due hereunder for the unexpired term as liquidated damages and not as a penalty, and [Plaintiff] shall have no further obligation to perform under this Agreement.

(Master Agreement ¶ 14.)  This provision was then modified by the Addendum negotiated by the parties so that "Paragraph 14 of the Agreement [was] modified by **changing the reference of 100% to 70%.**"  (Addendum ¶ 4 (emphasis in original).)

Both parties seek summary judgment on the enforceability of this provision. Defendant posits  that the liquidated damages provision is unenforceable for several reasons.  First, it asserts that Plaintiff has produced no evidence that 70% reasonably reflects its claimed losses.  Rather, at his deposition, Plaintiff's president, Elkins, testified that the standard contract was 100%, but, as a result of "horse trading" and the desire to gain Defendant as a customer, Elkins agreed to accept 70%.[7]  (Elkins Dep. 151:1–14.)   Moreover, Defendant presses that there is no evidence that

---

[7]    Defendant argues that Elkins acknowledged that this was not a situation where damages would be impossible to calculate and that, when asked if there was a way to calculate what Plaintiff's actual losses would be, Elkins said, "Yeah, sure." ( Def.'s Resp. Opp'n Summ. J. 13.)

This argument completely mischaracterizes the deposition testimony.  Although this question was posed to Elkins, his attorney objected and asked that the question be read back.  The court reporter—not Elkins—responded, "Yeah, sure."  (Elkins Dep. 161:4–13.)  Neither party provided the next page of the deposition where, presumably,  Elkins answered the question.

Plaintiff's actual losses are commensurate with the liquidated damages provision because Elkins could not explain any actual losses suffered by Plaintiff as a result of the contract's termination other than a loss of recurring future revenue.[8] (Elkins Dep. 156:7–157:19.)

In response to this argument, Plaintiff produces the Declaration of Scott Elkins who avers that he was personally responsible for negotiating the Master Agreement, including the liquidated damages provision, with Defendant. (Elkins Decl. ¶ 17.) The Declaration states that Plaintiff and Defendant re-negotiated the standard liquidated damages provision so that the liquidated damages would be only 70% of the payments due for the unexpired term. (Id. ¶¶ 18–19.) Elkins said he agreed to the 70% figure because, at the time of the negotiations, Plaintiff's profit margin for alarm monitoring was approximately 70% (as opposed to the current profit margin of 90%). (Id. ¶ 21.) Elkins explains that, given the complexity of proving the profit margin for alarm monitoring in the industry generally—a showing which would have required expert reports—he agreed to accept Defendant's request to reduce the standard liquidated damages percentage to 70%. (Id. ¶ 22.)

As Defendant correctly points out, however, Elkins's Affidavit is an after-the-fact attempt to justify the liquidated damages provision, making it improper for consideration here. During discovery, Defendant expressly requested production of "all documents which reflect the gross profit and net profit lost by [Plaintiff] in connection with the 'unexpired term' claim." (Def.'s Reply Br., Ex. A, p. 4.) Plaintiff declined to produce these documents, arguing that they constituted

---

[8]     Defendant also argues that its Director of Risk Management, Sarah Prinzi, "felt" as though Plaintiff was using the threat of liquidated damages as a threat to compel Defendant to pay the outstanding invoices and continue doing business with Plaintiff. (Prinzi Decl. ¶ 6.) According to Defendant, Plaintiff routinely waived liquidated damages, and charged them only when it needed leverage to keep a business relationship intact. As such, it posits that the liquidated damages clause should be deemed unenforceable as a matter of public policy. Plaintiff, however, responds that it had, in fact, pursued liquidated damages following termination of services.
         This is an issue of fact not appropriate for resolution on a motion for summary judgment. As such, I decline to resolve it here.

"confidential financial information" with "no relevance to the claims and defense in this matter." (<u>Id.</u> at 4–5.)   Defendant also sought documents "related to UAS's position that payment of 70 percent of the 'unexpired term' approximates [Plaintiff's] losses" or any documents reflecting Plaintiff's gross and net profit margins between 2018 and 2020 in connection with the services provided by Plaintiff.   (<u>Id.</u> at pp. 8–9.)   Plaintiff again declined to produce documents, objecting that:

> This case is for breach of an unambiguous contract.   The portion of UAS's claim for the "unexpired term" is based upon the unambiguous language of the agreements between the parties in which Boston Market negotiated and agreed to pay 70% of the payments that were due under the agreements as liquidated damages upon default by Boston Market.   Given this unambiguous, negotiated language, the information sought by this request is not relevant to the claims or defenses in this matter nor likely to lead to the discovery of admissible evidence.   Therefore, no documents are being produced in response to this request.

(<u>Id.</u> at p. 7.)

Such failure to provide facts and documents in discovery has preclusive effect.   Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, . . . unless the failure was substantially justified or harmless."   Fed. R. Civ. P. 37.   The exclusion of such evidence is meant to be "self-executing."   <u>Carmichael v. Thomson</u>, No. 14-cv-3323, 2018 WL 4629516, at *4 (D.N.J. Sep. 27, 2018).   This automatic sanction "provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing or on a motion, such as one under Rule 56."   <u>Id.</u> (quotation omitted).   Accordingly, Plaintiff's explicit and repeated refusal to produce documents relating to its profit margins forecloses it from relying on the current affidavit discussing its profit margins.

What remains are the undisputed facts that the parties negotiated a liquidated damages provision dictating that Plaintiff could recover 70% of the unexpired term of the multiple oral contracts in the event of a breach by Plaintiff.  There are no other related issues left for a factfinder to resolve.[9]  As a matter of law, the liquidated provision, on its face, constitutes an unenforceable penalty.  Plaintiff has not proffered any evidence that actual damages are difficult to estimate in the event of a breach.  Moreover, the record is devoid of evidence that this figure is an accurate pre-estimate of actual damages caused by the breach rather than normal "horse trading" used to gain Defendant as a client.  Plaintiff has offered nothing to show that these damages are commensurate with the actual loss it sustained.  Plaintiff also makes no effort to show what costs it saved or would not incur, as a result of Defendant's breach, in connection with servicing the remaining contracts for Defendant.  Finally, such a 70% recovery of a balance of an unexpired term of contract falls well above the threshold of what courts typically deem reasonable for liquidated damages.  Analyzing this contract provision as a matter of law in light of the undisputed material facts, I find that it constitutes an unenforceable penalty.

This conclusion, however, does not mean Plaintiff is foreclosed from recovering damages for the unexpired portion of the contract.  "While Pennsylvania contract law precludes a party from seeking actual damages for a breach of contract if there is an enforceable liquidated damages clause, if the liquidated damages clause is not enforceable, then the party may seek actual damages for the breach."  Cardiology Care for Children Inc. v. Ravi, No. 17-cv-4743, 2018 WL 1870717, at *5 (E.D. Pa. Apr. 18, 2018); see also Robins Motor Transp., Inc. v. Associated Rigging & Hauling Corp., 944 F. Supp. 409, 412 (E.D. Pa. 1996) ("Since we strike the liquidated damages clause here as an

---

[9]     While I remain cognizant that Defendant bears the burden of proving the unenforceability of the liquidated damages provision, Defendant cannot—without some modicum of financial information from Plaintiff—prove a negative.

unenforceable penalty, Robins Motor may only recover actual damages resulting from the breach of the tariff."). Pennsylvania law provides for recovery of expectation damages, which are "the losses caused and gains precluded by defendant's breach, to the extent that they are in excess of any savings made possible by nonperformance." ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 669 (3d Cir. 1998) (quotations omitted).

The record is devoid of evidence of actual damages. Accordingly, determination of the appropriate damages are inappropriate for resolution on a motion for summary judgment. Such damages must be determined by a factfinder following appropriate presentation of evidence.

　　　　　　3.　　Value of Alarm Panels

Lastly, Plaintiff seeks summary judgment on its claim for the value of the alarm panels that were installed in Defendant's restaurants. Plaintiff argues that, under paragraph 11 of the Master Agreement, it retained title to all equipment and material, including the alarm panels. According to Plaintiff's evidence, there are 63 alarm panels and 314 intrusion alarm panels at Defendant's restaurants, the total value of which is $128,850 ($550 x 63 plus $300 x 314). (Pl.'s Mot. Summ. J., Ex. J ("Ambrozy Decl.") ¶¶ 8–9 & Ex. I (Ambrozy Dep. 109:21–110:5; 215:1–22).)

Paragraph 11 of the Master Agreement provides:

> *Title to all equipment and materials shall remain at all times in UAS unless sold and until fully paid, except for Panels which shall remain titled in UAS at all times . . . .* Should Subscriber default hereunder, or upon termination of monitoring services for any reason, or if the System becomes a "runaway" system, or the System excessively signals UAS's remote/central station without apparent reason, Subscriber authorizes UAS to, without limitation, do any one or more of the following: remove the System from the Premises (if installation or sale price not fully paid), to disconnect the System, to shut down the Panel and/or the System and/or render some or all of the equipment incapable of signaling locally or communicating with any remote/central station and to enforce any and all of UAS's rights as a secured party under the Uniform Commercial Code. The exercise of such rights shall not be deemed a waiver of UAS's right to damages, and UAS shall have the right to enforce all other legal or equitable

27

> remedies or rights. If Subscriber prevents UAS from exercising its
> rights under this Section, Subscriber agrees to pay to UAS the sum of
> Fifty ($50.00) Dollars for each individual signal from the Premises
> received by the remote/central station as liquidated damages and not
> as a penalty, plus all actual attorneys' fees and court costs incurred by
> UAS as party in any action at law or in equity arising out of this
> paragraph.

(Master Agreement ¶ 11 (emphasis added).)

Defendant does not dispute that it is in possession of the panels or that Plaintiff is the lawful owner of these panels. Rather, it responds that the contract only gives Plaintiff the right to repossess them, not to charge for them. Defendant claims that it made the panels available for retrieval. Moreover, Defendant argues that even if Plaintiff had the right to demand payment for the panels, Plaintiff's valuation of such panels is overblown given that most of them are at least five years old and contain outdated electronics.

As to Defendant's argument that Plaintiff has no recourse but to repossess the panels, the contract language says otherwise. Specifically, the Master Agreement provides that "[s]hould Subscriber default hereunder . . . Subscriber authorizes UAS to, without limitation, do any one or more of the following: remove the System from the Premises (if installation or sale price not fully paid) . . . and to enforce any and all of UAS's rights as a secured party under the Uniform Commercial Code. *The exercise of such rights shall not be deemed a waiver of UAS's right to damages, and UAS shall have the right to enforce all other legal or equitable remedies or rights.*" (Master Agreement ¶ 11 (emphasis added).) Defendant has offered no legal basis that would preclude Plaintiff from suing for the value of the panels unlawfully retained.

As to Defendant's argument that it made 69 panels available for retrieval, I note that this offer was made on January 10, 2022, over a year after litigation was filed and just prior to motions for summary judgment. Defendant presents no other evidence that it offered to make the panels

available at the time of the breach.  Accordingly, at the time this lawsuit was filed, Plaintiff reasonably understood that its recourse was to sue for the value of the panels wrongfully retained.

As to Defendant's argument that Plaintiff knew that it had no right to charge for the panels, Defendant has misrepresented the evidence.  Defendant cites to a September 2, 2020 internal email chain from Plaintiff's president, Elkins to Plaintiff's director of National Accounts, Ambrozy.  In that email chain, Ambrozy noted that she was working to finalize the balance of the contract for Defendant and asked Elkins, "Are we billing for the panels? [If] so, how much."  (Def.'s Resp. Opp'n Summ. J., Ex. H.)  Defendant then relies on one sentence of Elkins's response, wherein he states, "It is my understanding that the contract does NOT require them to return the panels to us." (Id.)  Defendant fails to acknowledge that the remainder of this email states, "Please check with Mark.  If it does, we will charge them.  If not, we will not.  Make sense?"[10]  (Id.)  Accordingly, this email does not support Defendant's claim that it is not responsible for the value of the panels.

Given the record before me, I find that Plaintiff has established a legal entitlement to collect damages for the value of the panels in Defendant's possession.  A question still remains, however, as to the precise amount of that recovery.  Cindy Ambrozy, Plaintiff's Director of National Accounts provided a declaration representing that each alarm panel was $550 and each intrusion panel was $300.   At a total of 63 alarm panels and 314 intrusion panels, Defendant owes $128,850.[11] (Ambrozy Decl. ¶¶ 7–9.)  Scott Elkins explained why these panels are valued at this level:

---

[10]     This is Defendant's second misrepresentation of the evidence of record.

[11]     To the extent that Defendant argues that Ms. Ambrozy testified otherwise in her deposition, I find this argument to be yet another mischaracterization of the testimony.  Defendant's counsel asked Ms. Ambrozy, "Do you know if UAS is asking for $350 for each security panel?"  (Ambrozy Dep. 109:15–16.)  Ms. Ambrozy responded that she did not know because she had not "looked at the paperwork in a while," but she otherwise had no basis to disagree at that time.  (Id. at 109:21–110:5.)  In her declaration, she then clarified that after she looked at the paperwork, the value represented to her by Defendant's counsel was incorrect.  (Ambrozy Decl. ¶ 6.)

The DMP panel that's in this location or in these locations has lots of value.  It has a cell card, which have lots of value.  You're probably aware of the 3G to 5G conversion.

Well, we're swapping out cell cards left and right and there's value to that.  There's value to having the panels back.  There's value to using them for service.  There's plenty of value in the panel.  The panels are the engine that allows us to install systems and derive recurrent revenue, which over time, as you indicated, like over ten years or 100 months or whatever it was, we can earn maybe $1800.
. . .
Speaking specifically about the panels that we're talking about, they all have 3G cards that could be turned in to allow us to purchase 5G cards at a significantly reduce fee.  So, yes, those panels have value.

Those panels have value over the value of the panel.  But the irony here is we're talking about the value of the panels, but all Boston Market needs to do is return the panels in accordance with the agreement.  That's it.  They're our panels.  Just return them.

(Elkins Dep. 198:6–199:22.)

Defendant responds that Plaintiff has produced no documentary evidence to support Ambrozy's calculation of the value of the panels.  Defendant also cites to the testimony of Eli Burbank, Vice President of BCI Technologies, Inc. ("BCI"), the company which now provides alarm services to Defendant at locations formerly served by Plaintiff.[12]  Burbank explained that at most of Defendant's locations, the "can," which contains the electronics, needed to be replaced with new components, including a new motherboard and 4G cellular card because the 3G cards in Plaintiff's panels are "outdated" technology.  (Def.'s Resp. Opp'n Summ. J., Ex. K, Dep. of Eli Burbank ("Burbank Dep.") 24:19–23, 26:5–18.)  He further indicated that the 3G cards cannot be

---

[12]    Plaintiff argues that I should not consider this portion of Mr. Burbank's testimony as he has not been identified as an expert and, therefore, he cannot testify as to the value of the panels.  Mr. Burbank, however, has worked with BCI for twenty years and has extensive experience with alarm panels.  (Burbank Dep. at 8:22–25:15.)  Under Federal Rule of Evidence 701, a lay witness with first-hand knowledge can offer an opinion akin to expert testimony as long as the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion and is testifying based on experience or personal knowledge.  Fed. R. Evid. 701;  Wilburn v. Maritrans GP Inc., 139 F.3d 350, 356 (3d Cir. 1998).

used for any purpose once they've been switched out and noted that he would throw away Plaintiff's electronics because there's no value to a 3G communicator.  (Id. at 30:19–22, 31:22-31:5.)  If he were to pay for just the "can" for an intrusion system, he would pay approximately $20.  (Id. at 50:21–51:5.)

Such conflicting testimony creates a genuine issue of material fact as to the amount of damages recoverable for the panels.  Thus, although I find that Plaintiff is entitled to recover some monetary amount for the panels retained by Defendant, the precise value of those panels remains a question for a factfinder.

C.    **Plaintiff's Conversion Claim**

Defendant moves for summary judgment as to Plaintiff's conversion claim.  Plaintiff has not responded to this portion of Defendant's Motion and, in any event, such a claim is barred by Pennsylvania's gist of the action doctrine because the parties' relationship is governed by contract. See eToll, Inc. v. Elias/Savio Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  Accordingly, I will grant summary judgment on this claim in favor of Defendant and against Plaintiff.

D.    **Defendant's Counterclaim**

Plaintiff seeks summary judgment on Defendant's counterclaim for breach of contract. Defendant has affirmatively withdrawn that counterclaim.

IV.    **CONCLUSION**

In light of the foregoing, I find that Plaintiff has established, as a matter of law, the existence and breach of oral contracts for the installation and provision of alarm monitoring services. Nonetheless, I decline to enter a damages amount as I find that a genuine issue of material fact remains regarding (a) whether the amount past due should include charges for annual fire inspections, (b) the amount of Plaintiff's reasonable expectation damages given the invalidity of the liquidated damages provision, and (c) the value of the alarm panels.  An appropriate order follows.

31