#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNIVERSAL ATLANTIC SYSTEMS, INC., | : | CIVIL ACTION |
| *Plaintiff*, | : | |
| v. | : | NO. 20-5291 |
| BOSTON MARKET CORPORATION, *et al.*, | : | |
| *Defendants.* | : | |

#### MEMORANDUM OPINION

**Goldberg, J.**                                                                                                                                                                                **June 9, 2022**

      This matter involves a breached contractual agreement between Plaintiff Universal Atlantic Systems, Inc. ("Plaintiff" or "UAS")—an installer of security systems—and its customer, Defendant Boston Market Corporation ("Defendant" or "Boston Market")—a chain of casual dining restaurants.[1] Following cross-motions for summary judgment, I entered judgment in favor of Plaintiff on several of its breach of contract claims but found that a genuine issue of material fact remained as to the amount of damages.

      On May 8, 2023, I held a bench trial on the remaining issues. Following testimony from Plaintiff's president, Scott Elkins, trial concluded and the parties each submitted proposed findings

---

[1] As I noted in my October 21, 2022 Memorandum Opinion, on February 22, 2022, UAS was sold via an Equity Purchase Agreement ("EPA"). Prior to the closing, UAS was a wholly owned subsidiary of Sunset Legacy, Inc. ("Sunset Legacy"). Pursuant to the agreement of the parties to the EPA, and immediately prior to the closing, UAS transferred and assigned its interest in and liabilities related to the current litigation to its parent, Sunset Legacy. Thereafter, on March 24, 2022, UAS and Sunset Legacy, with the consent of Boston Market, moved to substitute the plaintiff pursuant to Federal Rule of Civil Procedure 25(c). On April 13, 2022, I granted that motion, dismissed UAS from the case, and substituted Sunset Legacy as the named Plaintiff.
      I note that all of the relevant contracts and events involved UAS not Sunset Legacy. For clarity purposes, I will continue to refer to UAS as "Plaintiff" throughout this Memorandum Opinion.

of fact and conclusions of law. I will now enter judgment in favor of Plaintiff in the amount of $1,044,041.42.

I. **FACTUAL BACKGROUND**

The facts regarding the parties' business relationship and the events giving rise to this dispute are set forth at length in my October 21, 2022 Memorandum Opinion and are incorporated herein. See Universal Atlantic Sys., Inc. v. Boston Market Corp., No 20-cv-5291, 2022 WL 13829825 (E.D. Pa. Oct. 21, 2022).

Having found that Defendant breached its contracts with Plaintiff, the only issues remaining are:

1. Whether the $220,458 in past due amounts owed to Plaintiff for breach of the oral contracts should be reduced for the amounts billed for fire inspections and, if so, by how much;

2. The amount of damages Plaintiff may recover for the unexpired portions of the contracts; and

3. The value of the alarm panels retained by Defendant that Plaintiff is entitled to recover.

In addition, Plaintiff maintains a contractual entitlement to prejudgment interest and counsel fees.

The evidence of record as it pertains to each one of these issues is as follows:

II. **DISCUSSION**

A. **Amount Owed to Plaintiff for Past Due Amounts on Contracts**

At summary judgment, I held that Plaintiff was entitled to the past due amount on its contracts with Defendant in the total balance of $220,458. I noted, however, that, of that balance, some unknown amount was billed for annual fire inspections. Finding that a genuine issue of material fact remained as to whether such inspections were ever authorized by Defendant, that issue was reserved for trial.

There, Scott Elkins, Plaintiff's President, testified regarding the "oral authorization" provision within the parties' Master Agreement. This provision provided Defendant with the ability to contact Plaintiff and authorize it to provide any service at any time for any one of Defendant's locations. (N.T. 16:23–17:2; Pl.'s Ex. 1A.) Mr. Elkins testified that, pursuant to this provision, Defendant repeatedly authorized Plaintiff to conduct fire inspections, and Plaintiff conducted those inspections, issuing fire inspection reports as required. (N.T. 18:11–19, 21:10–13.) Mr. Elkins specifically identified several of Defendant's employees who provided such authorization, including Carol Bowker, Joe Devola, Whitney Plemons, and Sarah Prinzi. (N.T. 19:20—25.) According to Mr. Elkins, on various occasions, any one of these individuals would call either Mr. Elkins, Plaintiff's VP of Operations, Plaintiff's Director of National Accounts, Plaintiff's Installation Manager, or Plaintiff's Service Manager, and would request that fire inspections be performed. (N.T. 20:14–18.) Additionally, Mr. Elkins explained that, prior to new ownership taking over Defendant's business, Defendant regularly paid Plaintiff's invoices for fire inspections.[2] (N.T. 19:2–11.) Plaintiff presented documentary evidence establishing that $10,579.83 of the past due amounts billed was for fire inspections.[3] (N.T. at 26:14—28; Pl.'s Ex. 7.)

On cross-examination, Defendant's counsel pointed out the absence of documentary evidence showing that these inspections were authorized by either of the parties. (N.T. 21:4–6.) Defendant's counsel subsequently clarified that Defendant's position was not that it *never*

---

[2] In its pretrial memorandum and during the pretrial conference, Defendant argued, for the first time, that the amount past due also included services for intrusion alarm inspection, which Defendant claimed it had not authorized.
   At summary judgment, however, Defendant raised only the issue of fire alarm inspections and did not mention intrusion inspections. As such, I found that Plaintiff was owed $220,458 minus only the amounts billed for unauthorized fire inspections. Having not raised the issue of unauthorized intrusion alarm inspections and having not sought amendment of my summary judgment ruling, Defendant waived that issue for trial.

[3] At trial, Defendant objected to this exhibit. I overruled the objection but permitted Defendant to renew the objection in post-trial submissions. Defendant did not renew this objection.

3

authorized inspections—thus admitting that some of the fire inspections had, in fact, been orally requested by Defendant—but rather that some of the inspections were conducted without Defendant's permission. (N.T. 23:8–12.) Defendant, however, presented no evidence as to how many of the inspections at issue were authorized and how many were not. (Id. at 23:21–24.)

I credit Mr. Elkins's testimony regarding Defendant's authorization of fire alarm inspections, finding it based on both first-hand knowledge and awareness of the general custom by which Defendant authorized and paid for such inspections over the years. I also find that all the fire inspections billed were authorized by Defendant. Mr. Elkins's testimony, which is unrebutted, is sufficient to establish Plaintiff's entitlement to the full amount of $220,458 in past due damages.

### B. Amount Owed for Unexpired Portion of the Contracts

The second issue at trial concerned the amount Defendant owed for the unexpired portion of the parties' contracts. In its post-trial submission, however, Defendant represented that it "does not dispute that Plaintiff's evidence admitted at trial shows that Plaintiff is entitled to $189,681.14 in damages for the remaining balance of the contract." (Def.'s Post-trial Br. 2.) Accordingly, I will enter judgment in favor of Plaintiff for this amount.

### C. Plaintiff's Alarm Panels

The final category of damages disputed at trial encompassed the value of the alarm panels installed by Plaintiff in Defendant's stores and retained by Defendant subsequent to its contractual breach. Mr. Elkins testified that the value of a fire alarm panel is $550, and the amount of an intrusion panel is $300. (N.T. 42:25–43:3.) Trial evidence established that Defendant had retained 63 fire alarm panels and 314 intrusion alarm panels, for a total amount of $128,850 in damages owed. (Pl.'s Ex. 8.) Mr. Elkins explained that he determined the "go-forward" value of these panels by working with Plaintiff's Finance Department and Customer Care Department. (N.T. 43:10–13.) Based on this analysis, he noted that because fire alarm services are billed at a higher rate than

intrusion alarm services, the value of the fire alarm panel is greater than that of the burglar alarm panel. (N.T. 43:19–22.)

Mr. Elkins then testified that there were three buckets of revenue that allowed Plaintiff to generate value from the panels. First, the panels could be used for parts—such as the external can, the motherboard, or the cell card—and such parts could be used to repair a failed panel. (N.T. 44:10–17.) Second, the panels could be "redeployed into the field," which meant Plaintiff could put that panel into a customer's business without having to buy a new one. (N.T. 44:20–24.) Third, Mr. Elkins explained that although the panels' cell network cards were all 3G, and although the 3G network has been subject to "sunsets," the cards could have been returned to the manufacturer or distributor, and Plaintiff would have received a credit on new cards for customers. (N.T. 44:3–9.)

In an attempt to rebut this evidence, Defendant now argues, without citing any evidence, that the panels are worthless. Defendant asserts that Mr. Elkins could not identify a single vendor that would pay for any of these parts or who could substantiate the value Plaintiff would receive for the parts. Further, Defendant contends that 3G technology is obsolete and has no value. According to Defendant, because Plaintiff failed to present any documents to show the value of the alarm panels, I should presume that none exists.

I find Mr. Elkins's testimony regarding the value of the panels to be credible and well-founded. Mr. Elkins explained that the value of the panels was not limited to simply the value of the components, but rather was derived from multiple sources and extended to their ability to generate recurring revenue over time. (N.T. 65:23–66:25.) Defendant offered no contrary evidence. Accordingly, I will enter judgment on the value of the alarm panels in favor of Plaintiff in the amount of $128,850.

### D. Contractual Interest

Paragraph 17 of the parties' Master Agreement provides that "[a] finance charge of one and one-half (1-1/2%) percent per month (eighteen (18%) percent per year) will apply to all obligations not paid pursuant to the terms contained herein." (Pl.'s Ex. 1A.) Plaintiff seeks an award of interest on the amount of judgment entered against Plaintiff from June 16, 2020, the date of the termination of the contracts between UAS and BMC (Pl.'s Ex. 6), until the date the Judgment is entered.

The terms of the Master Agreement are clear, and Defendant has offered no responsive argument. Accordingly, I will award interest of 1 ½ percent per month on the total amount of the Judgment, excluding counsel fees, from June 16, 2020 to and including the date of this Judgment.[4]

### E. Counsel Fees

Paragraph 18 of the Master Agreement provides that Defendant "shall pay to [Plaintiff] all costs and expenses including, without limitation, actual attorneys' fees incurred by [Plaintiff] and Representatives in any dispute in connection with, arising out of or from, as a result of, related to or as a consequence of the relationship, rights, duties, responsibilities or obligations of the parties created by this Agreement." (Pl.'s Ex. 1A.) For purposes of this dispute, which arose out of the Master Agreement, Plaintiff was represented by counsel on a contingency fee basis with counsel entitled to receive forty percent of any recovery obtained by UAS in this matter. (Pl.'s Ex. 9, N.T. 49:11–14.) Mr. Elkins testified that, to date, counsel's fees have been earned and will be paid if and when judgment is awarded against Defendant. (N.T. 50:3–13.)

---

[4] Plaintiff argues that the finance charge provision of Paragraph 17 of the Master Agreement applies to "all obligations not paid pursuant to the terms contained herein," which includes Defendant's obligation to pay counsel fees as required by Paragraph 18. However, under Plaintiff's representation agreement with counsel, discussed *infra*, counsel is not owed fees unless and until it obtains some recovery in this matter. Accordingly, counsel fees would not be owed until the date of Judgment, meaning no interest will have accrued on counsel fees.

Defendant has offered no responsive argument or objection to either its obligation to pay counsel fees or the amount of the fees owed. Accordingly, consistent with the Plaintiff's representation agreement with counsel (Pl.'s Ex. 9), I will award Plaintiff counsel fees in the amount of 40% of the total judgment before interest.

### F. Total Amount of Judgment

In light of the foregoing, judgment will be awarded in favor of Plaintiff and against Defendant as follows:

| | |
|---|---|
| • Unpaid past due amounts: | $220,458.30 |
| • Balance of contract damages: | $189,681.14 |
| • Value of alarm panels: | $128,850.00 |
| **Subtotal** | **$538,989.44** |
| • Counsel fees (40% of recovery): | $215,595.78 |
| **Subtotal before interest** | **$754,585.22** |
| • Interest from 6/16/20 to 6/9/23[5] (1089 days at $265.80 per day): | $289,456.20 |
| **TOTAL JUDGMENT:** | **$1,044,041.42** |

An appropriate Judgment follows.

---

[5] An 18% yearly interest rate is calculated at 0.049315% per day. On a total judgment before counsel fees of $538,989.44, interest comes out to $265.80 per day.